**Edmund H. MULLOWNEY,**
**Plaintiff,**

v.

**Oveta Culp HOBBY, Secretary of the Department of Health, Education and Welfare, Defendant.**

**Civ. A. No. 6-54.**

United States District Court
D. Nebraska, Lincoln Division.
May 31, 1955.

Thomas M. Davies (Davis, Healey, Davies & Wilson), Lincoln, Neb., for plaintiff.

Donald R. Ross, U. S. Atty., and William C. Spire, Asst. U. S. Atty., Omaha, Neb., for defendant.

DELEHANT, District Judge.

Within the allowance, and jurisdictional grant, of Title 42 U.S.C.A. § 405 (g), the plaintiff brings this action against the defendant in her official capacity. No question is, or upon the record could be, tendered concerning the timeliness of the institution of the suit or the validity of process or its service.

The action arises in this setting. Plaintiff was born January 15, 1875 in Wisconsin. For many years he has resided in Lincoln, Nebraska. He consistently made his federal income tax returns upon the basis of his cash receipts. On November 12, 1952 he filed with Social Security Administration a written application on approved form for Federal old-age and survivors insurance benefits under Title II of the Social Security Act, as amended, 42 U.S.C.A. § 401 et seq. By letter dated June 10, 1953, plaintiff was notified of the denial by the Administrator of his claim. The denial was thus explained in the notice:

> "The Social Security Act provides for payment of old-age insurance benefits to a person fully insured. To be fully insured you must have 6 quarters of coverage. In making this determination you are advised that the amounts for January 1, 1951 through November 12, 1952 could not be included because such income represents proceeds from notes acquired prior to 1951 which represented income when acquired. Any amount realized on these notes subsequent thereto would actually be payment of a debt and therefore not net earnings from self-employment within the meaning of the Act."

On August 10, 1953, plaintiff requested hearing before a referee which was granted, and was held on September 15, 1953 at Lincoln. On October 30, 1953 the referee made and entered a decision upon the issue against plaintiff, who, on November 5, 1953 filed with the Office of Appeals Council, Social Security Administration, Department of Health, Education and Welfare, a request for review of the referee's decision. That request for review was denied by Office of Appeals Council on November 24, 1953; by letter of which date, with accompanying copy of the actual denial, plaintiff was notified of such action. This suit followed.

The complaint sets up the foregoing history and prays "that the court reverse the decision of the Department of Health, Education and Welfare, Social Security Administration, and allow plaintiff's application for old-age Insurance Benefits under the provisions of the Social Security Act." The defendant's answer prays for the dismissal of the complaint and the affirmance of the challenged decision. It denies the court's jurisdiction to grant the relief prayed for and cites Title 42 U.S.C.A. § 405(g) as the limitation upon the court's authority; submits the transcript of the record on which the decision was made and the findings and conclusions of the defendant; admits and alleges the proceedings had upon the plaintiff's claim as already outlined and alleges that, to have been a fully insured individual under Social Security Act, the plaintiff must have had a minimum of six quarters of coverage as those terms are defined in said Act; that his services prior to October 18, 1949 were not rendered in "employment" covered by the Act; that his remuneration for such services did not constitute wages within the meaning of the Act; that the amounts reported by plaintiff as self-employment income for 1951 and 1952 did not constitute net earnings from self-employment as that term is defined in Section 211(a) of the Act, but must be treated as return on capital assets acquired in 1949; that the defendant's findings are supported by substantial evidence and are conclusive; and that upon the facts found by the referee and

the law the defendant correctly decided that plaintiff was not entitled to the old-age insurance benefits for which he had applied.

By stipulation of the parties, allowed by the court, the action was submitted upon the record tendered with the answer and upon typewritten briefs.

I. Quotation of the essential findings and ruling of Referee:

"The material evidence bearing on the issue in this case may be summarized as follows: In 1926 the City National Bank of Lincoln, Nebraska (hereafter called "the bank") discontinued its operations and in that year Stanley Maly, president of the bank, and claimant, who was vice president and cashier, were appointed by the Board of Directors and stockholders as liquidating agent and assistant liquidating agent, respectively. From 1926 to 1949 Mr. Maly and claimant managed the assets and liquidated them. The bank performed no functions after 1926 and the liquidating agent and his assistant had full control over the assets of the bank. For his services from 1940 to October 1949 claimant was paid about $50 a month from the funds of the bank which Mr. Maly and he controlled.

"On October 18, 1949 the liquidation of the bank was terminated, and an agreement was made by the directors of the bank with Mr. Maly and the claimant whereby for their past services in liquidating the bank's assets they would receive certain property. The property claimant received as a result of this agreement was in three classes: First, from cash on hand after the stockholders and all taxes had been paid, $2000 or $2500; second, certain commercial promissory notes; third, contracts, which the bank had held, to purchase Canadian farm properties. The purchase contracts provided for the payment of the value of one-third of the annual crops grown on the land.

"Since October 18, 1949 when the terminal agreement was made, the claimant has collected nothing from the commercial promissory notes. He has collected amounts derived from shares of crops grown, which have been paid on the contracts to purchase Canadian farm property, and the amounts so derived were reported as self-employment income, i. e., $2600 for the year 1951 and $4200 for the year 1952. From this same source in 1950 he received $1732.40 which he reported in his 1950 income tax return.

Briefs have been delivered and the case is ready for ruling.

The essential findings of the Referee, which, upon denial by the Office of Appeals Council of the request for review, became the defendant's findings are set out in an extended verbatim excerpt from the Referee's decision as a footnote hereto.[1]

"The claimant stated that the amounts reported as self-employment income for 1951 and 1952 represent largely payments of principal. The only record of interest collected on the contracts in these two years was $297.08 collected on October 9, 1951 with respect to one purchase contract; the claimant received only one-half of this amount.

"In connection with the purchase contracts, as well as the commercial promissory notes which claimant received in 1949, he stated that these contracts and notes had been charged off a number of years earlier by Mr. Maly and himself as worthless and that therefore in the year 1949 when they were received by him they had no fair market value. More particularly, in connection with the purchase contracts, claimant testified that in 1949 he could not determine if such contracts had any value in the absence of knowledge of the value, if any, of crops grown on the lands involved. The referee has difficulty accepting this testimony in view of claimant's subsequent written statement that: "Farm income in Canada in the last few years was high and the purchasers paid off these contracts as fast as possible and did not stop at just a certain percent of the annual crop."

"Claimant, who has reported his income on a cash receipts basis, testified that the value of the contracts and the commercial promissory notes was not reported as taxable income in 1949, the year received, because they were regarded as valueless. It appears, however, that on some, though not all, of the purchase contracts transferred from the bank to claimant in October 1949 collections were made prior to October 18, 1949; the amounts so collected were turned over to the stockholders of the bank as a part of the total dividends paid to them. Thus, at least those purchase contracts upon which collections had been made before claimant acquired them had not proved worthless prior to October 18, 1949.

"After carefully considering all the evidence of record in this case the referee concludes and finds that the remuneration claimant received for his services as liq-

It is in order, first, to recognize the jurisdiction and scope of inquiry of the limitations imposed by statute upon the court in this case. Title 42 U.S.C.A. §

uidating agent prior to October 18, 1949 did not constitute wages within the meaning of the Social Security Act for the reason that, since the bank was not performing any of its functions after 1926 and its entire assets were fully controlled by its liquidating agents, the services of the claimant were not rendered in employment covered by the Social Security Act. The claimant was acting in a fiduciary capacity and as such could not be an employee of the entity he represented for he was not subject to its control.

"The referee further finds that the amounts reported by the claimant as self-employment income for the years 1951 and 1952 did not constitute net earnings from self-employment as that term is defined in section 211 (a) of the Social Security Act. The reason is that these amounts must be treated as return on capital assets acquired in 1949.

"Treasury Regulations 111 relating to income tax provide:

" 'Section 29.22(a) * * *

" '3. If services are paid for with something other than money, the fair market value of the thing taken, in payment is the amount to be included as income. * * *

" '4. Notes or other evidences of indebtedness received in payment for services constitutes income to the amount of their fair market value. * * * '

"Thus, whether the purchase contracts constituted income in 1949 and whether any or all of the amounts derived from the contracts in subsequent years constituted income in such years, as claimant contends, turn upon whether the contracts had a fair market value when received in 1949, and if so, what value. If the contracts had a fair market value in 1949 they constituted income to the extent of the fair market value in that year and, under chapter 1 of the Internal Revenue Code, became and were held as capital assets. The amounts subsequently derived from such contracts up to the fair market value in 1949 would be return of capital. Any amounts in excess of the fair market value would be income in the year received. The evidence of record to the effect that there was no fair market value is claimant's assertions that he and Mr. Maly had written off the purchase contracts as worthless. Contra, however, is the evidence that collections were made prior to October 18, 1949 on at least some of the purchase contracts the claimant received in the terminal agreement. Also,

it does not appear that in 1949 or thereafter an independent appraiser was consulted as to the fair market value, if any, of the contracts in question, which, in the year *immediately* after 1949 produced *substantial return for the claimant.*

"Weighing the evidence in the record the referee finds that the contracts to purchase Canadian farm property had a fair market value on October 18, 1949, though what such value is remains unknown. Because claimant has supplied no information from which the fair market value in 1949 can be ascertained, the referee, in the absence of some reasonable 1949 arithmetic base, has no alternative but to treat the amounts received in 1951 and 1952 wholly as return of capital.

"Counsel for claimant makes the argument that had not the claimant made two trips annually to Canada since 1949 to supervise the purchase contracts, and had he not possessed specialized knowledge, nothing would ever have been realized from the contracts. While granting that claimant appears to have closely supervised these contracts and applied his knowledge to this activity, the referee discounts this argument. In light of evidence discussed above the argument certainly does not prove the contracts were worthless in 1949.

"It is also argued that because the Internal Revenue Service has since 1949 accepted claimant's income tax returns in which he reported amounts realized from the contracts in question as income, the amounts reported for 1951 and 1952 must be treated as self-employment income. In the opinion of the referee this argument is without merit in the absence of any showing that the Internal Revenue Service was ever consulted on the matter.

"Finally, it is argued on behalf of the claimant that his income in 1951 and 1952 was 'either fees received as a fiduciary, or fees received as a director * * * in either of which case such income is self-employment income.' As discussed above, the bank ceased to exist in October 1949. The claimant's status as director or fiduciary was then terminated, and the referee so finds.

"From the fact that the amounts reported by claimant for the years 1951 and 1952 did not constitute net earnings from self-employment, within the meaning of section 211(a) of the Social Security Act, it follows, and the referee so finds, that

405(g) authorizes the institution and prosecution of such proceedings for review. It then provides, among other things:

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Administrator, with or without remanding the cause for a rehearing. The findings of the Administrator as to any fact, if supported by substantial evidence, shall be conclusive".

Both parties freely recognize that the present ruling must be in the nature of a review of the record brought here with the defendant's answer, and that the court is bound by the mandate of the statutory sentence last quoted.

By Title 42 U.S.C.A. § 402(a) (1–3) it is provided that:

"(a) Every individual who—

"(1) is a fully insured individual (as defined in section 414(a) of this title),

"(2) has attained retirement age (as defined in section 416(a) of this title), and

"(3) has filed application for old-age insurance benefits, shall be entitled to an old-age insurance benefit for each month, beginning with the first month after August 1950 in which such individual becomes so entitled to such insurance benefits and ending with the month preceding the month in which he dies. Such individual's old-age insurance benefit for any month shall be equal to his primary insurance amount (as defined in section 415(a) of this title) for such month."

Title 42 U.S.C.A. § 414(a) referred to in Section 402(a) (1), defines a " 'fully

insured individual' ", so far as is presently material, as

"(2) In the case of any individual who did not die prior to September 1, 1950, the term 'fully insured individual' means any individual who had not less than—

"(A) one quarter of coverage (whether acquired before or after such day) for each two of the quarters elapsing after 1950, or after the quarter in which he attained the age of twenty-one, whichever is later, and up to but excluding the quarter in which he attained retirement age, or died, whichever first occurred, except that in no case shall an individual be a fully insured individual unless he has at least six quarters of coverage; or

"(B) forty quarters of coverage."

Title 42 U.S.C.A. § 416(a), also referred to, thus defines "Retirement Age":

"(a) The term 'retirement age' means age sixty-five."

Title 42 U.S.C.A. § 415(a) follows:

"(a) (1) The primary insurance amount of an individual who attained age twenty-two after 1950 and with respect to whom not less than six of the quarters elapsing after 1950 are quarters of coverage shall be 50 per centum of the first $100 of his average monthly wage plus 15 per centum of the next $200 of such wage; except that if his average monthly wage is less than $50, his primary insurance amount shall be the amount appearing in column II of the following table on the line on which in column I appears his average monthly wage.

the claimant has acquired none of the six quarters of coverage necessary in his case for a fully insured status. It is

the decision of the referee that the claimant is not entitled to the old-age insurance benefits for which he applied."

| I<br>Average Month-<br>ly Wage | II<br>Primary Insur-<br>ance Amount |
|---|---|
| $30 or less | $20 |
| $31 | $21 |
| $32 | $22 |
| $33 | $23 |
| $34 | $24 |
| $35 to $49 | $25 |

"(2) The primary insurance amount of an individual who attained age twenty-two prior to 1951 and with respect to whom not less than six of the quarters elapsing after 1950 are quarters of coverage shall be whichever of the following is the larger—

"(A) the amount computed as provided in paragraph (1) of this subsection; or

"(B) the amount determined under subsection (c) of this section.

"(3) The primary insurance amount of any other individual shall be the amount determined under subsection (c) of this section."

Certain terms are statutorily defined or explained in the Act itself. They may now be noted.

The terms " 'net earnings from self-employment' " and " 'self-employment income' " are defined by the following language from Title 42 U.S.C.A. § 411 (a, b):

"(a) The term 'net earnings from self-employment' means the gross income, as computed under chapter 1 of Title 26, derived by an individual from any trade or business carried on by such individual, less the deductions allowed under such chapter which are attributable to such trade or business, plus his distributive share (whether or not distributed) of the ordinary net income or loss, as computed under section 183 of Title 26, from any trade or business carried on by a partnership of which he is a member; * *
* * * * * *

"(b) The term 'self-employment income' means the net earnings from self-employment derived by an individual (other than a non-resident alien individual) during any taxable year beginning after 1950; except that such term shall not include—

"(1) That part of the net earnings from self-employment which is in excess of: (A) $3,600, minus (B) the amount of the wages paid to such individual during the taxable year; or

"(2) The net earnings from self-employment, if such net earnings for the taxable year are less than $400."

Title 42 U.S.C.A. § 412(a) follows:

"For the purposes of determining average monthly wage and quarters of coverage the amount of self-employment income derived during any taxable year shall be credited to calendar quarters as follows:

"(a) In the case of a taxable year which is a calendar year the self-employment income of such taxable year shall be credited equally to each quarter of such calendar year."

And Title 42 U.S.C.A. § 413(a) (2) (B):

"(B) The term 'quarter of coverage' means, in the case of a quarter occurring after 1950, a quarter in which the individual has been paid $50 or more in wages or for which he has been credited (as determined under section 412 of this title) with $100 or more of self-employment income, * * *."

From Title 26 U.S.C.,[2] §. 481, the following definitions are taken:

"For the purposes of this subchapter—

"(a) Net earnings from self-employment. The term 'net earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this chap-

2. Dealing with income taxation.

ter which are attributable to such trade or business".

Provisions are made for the promulgation of pertinent regulations and for procedure upon claims in Title 42 U.S. C.A. § 405(a, b) as follows:

"(a) The Administrator shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

"Findings of fact; decisions; review; hearings

"(b) The Administrator is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Whenever requested by any such individual or whenever requested by a wife, widow, former wife divorced, husband, widower, child, or parent who makes a showing in writing that his or her rights may be prejudiced by any decision the Administrator has rendered, he shall give such applicant and such other individual reasonable notice and opportunity for a hearing with respect to such decision, and, if a hearing is held, shall, on the basis of evidence adduced at the hearing, affirm, modify, or reverse his findings of fact and such decision. The Administrator is further authorized, on his own motion, to hold such hearings and to conduct such investigations and other proceedings as he may deem necessary or proper for the administration of this subchapter. In the course of any hearing, investigation, or other proceeding, he may administer oaths and affirmations, examine witnesses, and receive evidence. Evidence may be received at any hearing before the Administrator even though inadmissible under rules of evidence applicable to court procedure."

Certain Regulations that should be noted are collected in a footnote.[3]

---

3. "20 C.F.R. 404.1051:

"(a) The gross income and deductions of an individual attributable to a trade or business, for the purpose of ascertaining his net earnings from self-employment, are to be determined by reference to the provisions of law and regulations applicable with respect to the taxes imposed by sections 11 and 12 of the Internal Revenue Code.

"20 C.F.R. 404.1057:

"(a) It is necessary for an individual to carry on a trade or business, either as an individual or a member of a partnership, in order for him to have net earnings from self-employment. * * * the term 'trade or business', for the purpose of the tax on self-employment income, shall have the same meaning as when used in section 23 of the Internal Revenue Code. * * *

"20 C.F.R. 422.6 (d):

"A claimant may secure a court review of a decision by a referee, if the Appeals Council has denied the claimant's request for review, or of a decision by the Appeals Council by instituting a civil action in the United States District Court of his residence. Such action must be filed within 60 days of the Appeals Council's notice of denial of request for review of the referee's decision or notice of decision by the Appeals Council. * * *

"26 C.F.R. 29.481–1:

"(a) *Definition.* Subject to the special rules discussed in paragraph (c) of this section and to the exclusions discussed in section 29.481–3, the term 'net earnings from self-employment' means:

"(1) The gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by Chapter 1 of the Internal Revenue Code which are attributable to such trade or business, plus

"(2) His distributive share (whether or not distributed) of the ordinary net income (or minus the ordinary loss) from any trade or business, as computed under section 183, carried on by any partnership of which he is a member.

"(b) *Included in net earnings.* The gross

■ In meeting the issue before it, the court's primary and controlling inquiry is whether the findings of fact by the defendant (see footnote 1) are supported by substantial evidence. If it be answered in the affirmative, those findings are made conclusive under the plain language of Title 42 U.S.C.A. § 405(g), supra. In numerous decisions, some under the Act now involved, others arising from other legislation comparable in principle, this rule has been administered. Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655; Social Security Board v. Warren, 8 Cir., 142 F.2d 974; Walker v. Altmeyer, 2 Cir., 137 F. 2d 531; United States v. LaLone, 9 Cir., 152 F.2d 43;[4] Thompson v. Social Security Board, 81 U.S.App.D.C. 27, 154 F.2d 204; Eschbach v. Contractors, Pacific Naval Air Bases, 7 Cir., 181 F.2d 860; Johnson v. Altmeyer, D.C.Ky., 63 F.Supp. 796; Carey v. Social Security Board, D.C.Ky., 62 F.Supp. 458; Holland v. Altmeyer, D.C.Minn., 60 F.Supp. 954; Rambin v. Ewing, D.C.La., 106 F.Supp. 268. Extensive quotation from those sources is not warranted. But it is appropriate to take note of the expression and scope of the rule as it is disclosed in some of them.

In Gray v. Powell, supra [314 U.S. 402, 62 S.Ct. 332], the court declared broadly that:

"In a matter left specifically by Congress to the determination of an administrative body * * * the function of review placed upon the courts * * * is fully performed when they determine that there has been a fair hearing, with notice and an opportunity to present the circumstances and arguments to the decisive body, and an application of the statute in a just and reasoned manner. * * *

"Although we have here no dispute as to the evidentiary facts, that does not permit a court to substitute its judgment for that of the Director. * * * It is not the province of a court to absorb the administrative functions to such an extent that the executive or legislative agencies become mere fact finding bodies deprived of the advantages of prompt and definite action."

In reasoning to its conclusion in National Labor Relations Board v. Hearst Publications, Inc., supra [322 U.S. 111,

income and deductions of an individual attributable to a trade or business, for the purpose of ascertaining his net earnings from self-employment, are to be determined by reference to the provisions of law and regulations applicable with respect to the taxes imposed by sections 11 and 12.

"(c) *Excluded from net earnings.* For the purpose of computing net earnings from self-employment, the gross income derived by an individual from a trade or business carried on by him, the allowable deductions attributable to such trade or business, and the individual's distributive share of the ordinary net income or ordinary net loss from any trade or business carried on by a partnership of which he is a member shall be computed in accordance with the following special rules:

\* \* \* \* \*

"(4) *Gain or loss from disposition of* *property.* There is excluded any gain or loss: (i) which is considered as gain or loss from the sale or exchange of a capital asset; * * *.

"26 C.F.R. 29.22(a):

"(3) *Compensation paid other than in cash.* If services are paid for with something other than money, the fair market value of the thing taken in payment is the amount to be included as income. \* \* \*

"(4) *Compensation paid in notes.* Notes or other evidences of indebtedness received in payment for services constitute income to the amount of their fair market value. \* \* \*."

4. Reversing LaLone v. United States, D. C.Wash., 57 F.Supp. 947, which itself recognized the limitation upon the District Court's area of authority but in apparent confusion failed to remain within it.

64 S.Ct. 861], the court asserted that the National Labor Relations Board's "determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law."

Walker v. Altmeyer, supra [137 F.2d 533], indicates the elements of an administrator's decision which are binding upon the reviewing court in this language:

"The facts underlying that decision which were found on substantial evidence were, of course, binding upon the district court. That is not the question this appeal raises. The error into which the court fell was not that of making new and contrary findings but that of substituting new and contrary inference of its own from the found facts which led it to reverse the administrative conclusion which had been reached as to the employee status of the plaintiff. That sort of action went beyond the power of the district court to review in such a suit as this. It was the judgment of the administrative body as to an employer-employee relationship rather than that of the court which the statute made effective provided that judgment was based upon conclusions reasonably reached upon due consideration of all relevant issues presented after parties in interest had been given a fair hearing or a fair opportunity to be heard upon the facts and the applicable law."

That thought is emphasized with direct reference to Title 42 U.S.C.A. § 405(g), in United States v. LaLone, supra [152 F.2d 44], in this manner:

"Under this section of the Social Security Act providing for appeals from an administrative board, as under other similar acts, the board's findings of fact must be sustained if the court finds they are supported by substantial evidence. *This same finality extends to the Board's inferences and conclusions from the* evidence if a substantial basis is found for them." (Emphasis added.)

Finally, Judge Nordbye, in Holland v. Altmeyer, supra [60 F.Supp. 957], with characteristic thoroughness and logic, offers this observation:

"At the outset, it seems clear that this Court cannot substitute its inferences from the admitted facts in place of those indicated by the Referee. The judgment of the administrative body must prevail if the 'judgment was based upon conclusions reasonably reached upon due consideration of all relevant issues presented after parties in interest had been given a fair hearing or a fair opportunity to be heard upon the facts and the applicable law. Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301.' Walker v. Altmeyer, 2 Cir., 137 F.2d 531, 533. Granted that the element of control as reflected in this record over the details and means by which the supervisory duties of the District Supervisor should be performed may seem to fall short of meeting the standards which many cases require in spelling out the relationship of employer and employee, the Court should not be unmindful of the responsibility which Congress has vested in this administrative body under the Social Security Act. The language of the Supreme Court in National Labor Relations Board v. Hearst [Publications, Inc.], 322 U.S. 111, 130, 64 S.Ct. 851, 860, 88 L.Ed. 1170, which states, 'That task has been assigned primarily to the agency created by Congress to administer the Act,' is applicable herein. What this Court may deduce from the admitted facts might seem more sound and plausible than the findings of the Referee in light of the generally accepted definition of employer and employee and in light of the regulations of the Social Security Board. But, obviously, if each court were vested with authority to control the

interpretation of the various relationships which come before the Social Security Board, there would probably be an utter lack of uniformity in the administration of the Act. Situations similar to the instant one have, or undoubtedly will, arise in various parts of the country and uniformity of administration of the Act is highly desirable. It must be remembered that the Board is confronted not only with the responsibility of determining when a recipient of social security benefits has lost such benefit payments by reason of employment within the meaning of the Act, but also the primary question as to when the wage earner is entitled to the benefits of the Act."

No one contends that there has been any failure in the administrative handling of plaintiff's claim, to have a fair hearing, or any deficiency in notice of the hearing or denial of the opportunity to present the circumstances or arguments to the decisive body. The plaintiff directly challenges the finding that he was not a fully insured individual and did not have at least six quarters of coverage, and asserts, contrary to the finding upon the point, that the amounts received and reported by him in 1951 and 1952 were "self-employment income under the provisions of the Social Security Act and the Internal Revenue Act". That is the heart of the controversy.

██ Upon the issues made the court is persuaded and finds that the findings of fact by the defendant (see footnote 1) and each of them are supported by substantial evidence and have "warrant in the record and a reasonable basis in law". It necessarily follows that by its order herein, the court must deny the prayer of plaintiff's complaint, affirm the findings of fact and decision of the defendant and dismiss plaintiff's action and complaint at his costs.

If some relatively insignificant discrepancies and inaccurate conclusions be disregarded, it may not be thought that there is any factual dispute in the basic record. It is the plaintiff's own record made by him through his documentary showings and his oral testimony before the referee. Allowance has to be made for some confusion in statements rooted in his advanced age and infirmity in hearing. And it has been made by the referee, and through him the defendant, for the confusion is obvious and the facts involved in it quite clear.

The problem emerges out of a narrow and fairly simple factual setting, which, with no intent to make an adequate factual restatement, may be recalled.

One Stanley Maly and the plaintiff had been the two principal officers of City National Bank of Lincoln. In 1926 its stockholders placed it in liquidation. This was effected through the incorporation and launching of a new bank, City National Bank in Lincoln which assumed the original bank's liabilities and took over certain of its assets and received a promissory note of the earlier bank to cover the remainder of the liabilities. In passing, it is observed with no significance in the case that the life of the new bank was short. It went into voluntary liquidation through First National Bank of Lincoln late in 1928 and was dissolved shortly thereafter.

The original City National Bank, after the termination of its regular banking operations, retained its charter until October 18, 1949 or very shortly thereafter; and it held for liquidation and accounting and distribution to its terminal stockholders, after the satisfaction of its note to the new bank, the usual residual assets of a banking association in its plight. These included miscellaneous parcels of real estate and various securities including promissory notes. Most, if not all of such assets were within the classification of "doubtful" or "slow" or both. That circumstance was at the root of the more than a score of years during which the liquidation of the retained assets continued.

Maly was designated by the stockholders as liquidating officer and plaintiff as assistant liquidating officer, but the latter did the greater part of the work of liqui-

dation. By October 18, 1949 the liquidation had proceeded to the point beyond which further realization was uncertain and in any event calculated to be slow, and where the liquidating officers had in hand somewhat more than enough cash, above income taxes and other taxes then due, to make a final payment of 13 percent upon the corporation's capital stock, bringing the total of such payments during liquidation up to 38 percent. On that date by resolution of the directors of the old banking association a proposal of Maly and plaintiff was accepted whereby, to quote from the resolution, it was resolved:

> "that the stockholders of record, or their assignees, be paid forthwith a dividend of 13%; and that all land contracts or property of whatever nature, meaning to be all assets of said bank after said 13% dividend is paid, is hereby sold, assigned and ordered and directed to be transferred to said Stanley Maly and E. H. Mullowney; that upon such transfer and delivery thereof to said Stanley Maly and E. H. Mullowney, this bank is to be dissolved and certificate of dissolution is to be forwarded to the Comptroller of the Currency."

On the same day Maly and plaintiff made a written agreement between themselves whereby the property thus transferred to them was to be owned and, subject to the expense of its liquidation, distributed as between them in equal shares.

Among the property thus transferred to Maly and plaintiff were about $4,000 or $5,000 in cash, which they divided, and some promissory notes of sundry unidentified individuals and corporations of which none are shown to have been paid. Those items may be disregarded for they do not enter into this action.

The other item of property thus transferred to Maly and plaintiff consisted of the vendor's interest or equity in several parcels of farm land in Canada, and, it would seem, in the province of Saskatchewan. Continental Mortgage and Land Company, a corporation with its principal office in Lincoln, had become heavily indebted, as a borrower, to City National Bank of Lincoln; and by way of security had assigned and transferred (in such manner that title came ultimately to the liquidating officers, or one of them) its interest as vendor in written agreements for the sale of the several parcels of such land to different purchasers, generally subject to underlying first mortgage liens. Each contract specified a consideration or sale price and an interest rate upon the portion thereof remaining from time to time unpaid, but also provided that the unpaid portion of the sale price should be paid by the yearly delivery to the vendor of the proceeds of a designated portion of the crop raised from year to year on the premises sold. Payments upon the contracts were to be made in Canada. And during much of the liquidating period actions to enforce contracts of that nature were subject to interception, and the contracts themselves amenable to reduction orders, under Farmers Creditors Arrangements Acts of the provincial legislative body.[5] The aggregate balances unpaid upon those agreements and the amounts of prior mortgages underlying them are not intelligibly shown in the record.

It is entirely out of payments received upon some of those Canadian real estate contracts that the proceeds came which were divided between Maly and plaintiff in 1951 and 1952 and on his portion of which he relies to establish his claim of self-employment net earnings in order to support his claim to six quarters of coverage under the Act. In the record the source of such items is sometimes identified as "notes" or "Canadian notes". But that identification is not really accurate.

It is certain in this court's estimation that by the transaction of October 18, 1949 Maly and plaintiff acquired the full title to the vendor's interests and rights under those land sale contracts.

5.  Somewhat comparable to the familiar Frazier Lemke Act, 11 U.S.C.A. § 203.

That, too, was the final item of payment to them made by City National Bank of Lincoln; for, having thus divested itself of its last remnants of property, it surrendered its charter and ceased to exist. Whatever Maly and plaintiff got in consideration of City National Bank's obligation, legal or moral, to them for theretofore uncompensated services [6] as liquidating officers they got then. This conclusion is neither nullified nor impaired by the acknowledged difficulty of arriving on October 18, 1940 at an exact conclusion respecting the then value of the interests transferred in the Canadian land contracts. The court does not consider that it was wholly impossible at that time to place a value upon them. From their character and the prevailing economic conditions and Canadian debt adjustment legislation the task was rendered difficult; but it was not insuperable. Besides, whether their value was precisely determinable or not, they were unequivocally transferred to Maly and plaintiff on October 18, 1949.

Whatever the two gentlemen received on account of the Canadian contracts after October 18, 1949 [7] was received as payments to them of moneys owed to them personally. It was a return of their own property. And it was that no less than if they had purchased the equities in the contracts on October 18, 1949 in consideration of cash in hand or an exchange of properties. The court perceives no rational escape from the conclusion of the referee and the defendant upon the matter.

This court agrees with the referee and the defendant that plaintiff's receipts in 1951 and 1952 were not net earnings from self-employment or self-employment income. He carried on no trade or business within the thought of Title 26 U.S.

C.A. § 481(a), supra, and no basis has been established for arrival at self-employment income under subsection (b) of the same section.

Similarly, for failure to meet the definition of Title 42 U.S.C.A. § 413(a) (2) (B), supra, he does not establish any "quarters of coverage". And on that account, he fails to meet the definition of a " 'fully insured individual' " under Title 42 U.S.C.A. § 414(a) (2) (A) and (B), supra.

In sum, the court arrives at the result and judgment already announced, principally because the findings of the referee and the defendant are substantially and fully supported by the evidence in the record, but also because it is convinced that the position taken by plaintiff is without reasonable support in fact or in law upon the record made.

---

6. It must not be thought that plaintiff had worked for nothing as assistant liquidation officer up to October 18, 1949. That is not the fact. He got no pay, it is true, for liquidation services as such, so long as he remained in the banking business as an officer of City National Bank in Lincoln, and from 1928 of First National Bank of Lincoln, from which he retired in 1940. But from a short time after his retirement in 1940 until October 18, 1949 he received for liquidation services fifty dollars per month plus five dollars per day and his expenses while on special trips, plus commissions on the sales of some of the real estate under liquidation.

7. And they received substantial sums in 1950 that are not presently involved.