ROBERT E. MILLIGAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Milligan
Docket No. 2694-91
United States Tax Court
T.C. Memo 1992-655; 1992 Tax Ct. Memo LEXIS 693; 64 T.C.M. (CCH) 1282; November 9, 1992, Filed *693 Decision will be entered for respondent. For Petitioner: J. Arthur Calvert, David L. Haga and Robert P. Solliday. For Respondent: Andrew J. Horning. GOLDBERG
GOLDBERG
MEMORANDUM OPINION GOLDBERG, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) and Rules 180, 181, and 182. All section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Respondent determined a deficiency in petitioner's Federal income tax for tax year 1987 in the amount of $ 3,076. The issue for decision is whether $ 25,121 which petitioner received in 1987 as "Termination Payments" from the State Farm Insurance Cos. constitutes income subject to self-employment tax. This case was submitted fully stipulated pursuant to Rule 122. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioner resided in Prescott, Arizona, when he filed his petition. On April 12, 1949, petitioner became an exclusive agent of the State Farm Insurance Cos. He continued in that capacity until his retirement on August 31, 1983. At all times his relationship to State Farm was *694 that of an independent contractor. While petitioner was an agent of State Farm, he solicited applications for insurance from all the State Farm Insurance Cos. listed below, collected payments, and assisted policyholders, among other duties. Petitioner's compensation for performance of these duties consisted of commissions for new policies and commissions for renewals. The State Farm Insurance Cos. consisted of four sub-companies: State Farm Mutual Automobile Insurance Co., State Farm Life Insurance Co., State Farm Fire and Casualty Co., and State Farm General Insurance Co. Hereinafter, these companies will be collectively referred to as State Farm. Petitioner entered into a series of contracts with State Farm which set forth the terms of his agency relationship. The dispute in this case concerns the Termination Payments which petitioner received pursuant to the State Farm Agent's Agreement, Form AA3, which he signed on March 1, 1977 (the Agreement). This Agreement, including addenda, was a successor to three other State Farm agreements which petitioner signed: on January 1, 1966 (State Farm Agent's Agreement, Form AA 660); on November 1, 1955 (Local Agent's Appointment Agreement, *695 Form LA 540.1 with attachments), and on April 12, 1949 (Local Agent's Appointment Agreement, Form A4921). When petitioner retired in 1983, he was 62 years old; he then closed his office and engaged in no further activity in the insurance business. Petitioner's Agreement terminated upon his retirement, and he became eligible for Termination Payments under section IV of the Agreement. During taxable years 1985 and 1986, petitioner reported the Termination Payments he received for purposes of self-employment tax as well as income tax. For taxable year 1987, petitioner reported the amount of his Termination Payments as income, but did not report it for purposes of self-employment tax. Section IV of the Agreement provides that Termination Payments will be paid for a period of 5 years to an agent whose agreement has been terminated, provided that the agent had 2 or more years of continuous service under either the Agreement or a prior agreement. This is so regardless of whether the agent dies, retires, or separates from service voluntarily or involuntarily. First-year Termination Payments are payable to the agent or his legal representative according to a complex formula based upon *696 a percentage of the income generated by personally produced policies. In general, the first-year payments vary in amount from month to month, since they are computed on the basis of 20 percent of the agent's earnings in the 12 months prior to termination of the Agreement. If the first-year payments reach a certain threshold, the monthly Termination Payments for the second through fifth years are equal to 4 times the total first-year payments divided by 48. Termination Payments from State Farm Life Insurance Co., also payable under Section IV of the Agreement, are to be paid over a 5-year period and are equal to the payments that would have been payable if the Agreement had not been terminated. Petitioner concedes on brief that Termination Payments paid by State Farm Life Insurance Co. are renewal commissions subject to self-employment tax. Section V of the Agreement provides for Extended Termination Payments to be made to former agents who have qualified for and previously received Termination Payments. These begin on the last day of the 61st month after termination and continue until the last day of the month in which the agent dies. The Agreement provides that Extended Termination *697 Payments are made to agents who have fulfilled certain conditions involving age and duration and continuity of service. These payments have a bearing on this case, although we are not asked to address their characterization for self-employment tax purposes. The Agreement provides that, upon termination, former agents shall not act or represent themselves in any way as agents or representatives of State Farm. It further provides that, for a period of 1 year, former agents may not sell insurance offered by a competitor to their former State Farm customers. The penalty for engaging in competition with State Farm is forfeiture of the agent's last 48 months of Termination Payments and, in the case of a retiring agent, forfeiture of Extended Termination Payments as well. Respondent determined that petitioner's Termination Payments constituted income from self-employment within the meaning of section 1401 and were consequently subject to self-employment tax. On brief, petitioner argues in the alternative that Termination Payments constitute either (1) consideration for the transfer of his insurance business to State Farm, including goodwill and his covenant not to compete, or (2) payments *698 not subject to self-employment tax because termination of petitioner's trade or business was a precondition to their receipt. Sale of Petitioner's Business
Petitioner argues on brief that Termination Payments represent consideration for petitioner's book of business, covenant not to complete, and goodwill. In other words, petitioner seeks to characterize the Termination Payments as payments for the sale of his business to State Farm. There is no evidence in the record to support this argument. Petitioner's own petition states as a fact on which petitioner relies: "The petitioner, as a result of his retirement will receive termination payments for the remainder of his life." (Emphasis supplied.) Termination Payments are provided for in the State Farm Agent's Agreement, not in a buyout agreement. A letter addressed to petitioner from State Farm describes Termination Payments as "contingent, contractual payments made under provisions of the agreement. If the contingencies are met, they become payable upon termination of the agreement whether due to retirement, resignation, or death." It is clear from the terms of the Agreement that the payments in question were part *699 of the consideration which State Farm offered its agents to induce them to enter into the Agreement. Compliance with the agreement not to compete is a condition precedent to payment of the last 4 years of the Termination Payments. In the case of a retiree such as petitioner, compliance with the agreement not to compete is also necessary for vesting of the right to Extended Termination Payments. As Extended Termination Payments are payable until death, the amount which petitioner will receive under the Agreement is open-ended, not fixed and determinable, as in the case of a sale. Petitioner cites Darden v. Nationwide Mut. Ins. Co., 922 F.2d 203, 208 (4th Cir. 1991), revd. on other grounds     U.S.    , 112 S. Ct. 1344 (1992), which stated, in dicta, that the Extended Earnings Plan of Nationwide Mutual Insurance Co. (Nationwide) was "in the nature of a buy-out in which the departing agent receives payments based on what he leaves behind in the way of business for his successor." Fraver v. North Carolina Farm Bureau Mut. Ins. Co., 801 F.2d 675, 678 (4th Cir. 1986) (holding insurance agent *700 not an employee for ERISA purposes). This characterization was based on the fact that the payments in question were funded by the agent's policies taken over by the agent's successor, an insufficient reason for us to accept the buyout theory for purposes of Federal income tax. On the contrary, in Erickson v. Commissioner, T.C. Memo. 1992-585, this Court held that a settlement agreement which succeeded and modified an insurance agent's contract for payment of previously earned commissions, was not a buyout "leveling agreement". In this decision we relied upon the facts that the record contained no express sales agreement and no evidence of vendible business assets. The same circumstances recur in this case and persuade us that no sale has taken place. We decline to adopt petitioner's characterization of Termination Payments as consideration for the sale of his business and turn to petitioner's argument that Termination Payments -- being made on condition of petitioner's cessation of all business activity -- are for that reason not subject to self-employment tax. Application of Self-employment Tax to Payments Received After Cessation of Business *701 Activity
Section 1401 imposes a tax upon each individual's "self-employment income". "Self-employment income" is defined in section 1402(b) as "net earnings from self-employment", with certain exceptions not relevant to this case. "Net earnings from self-employment" is defined in section 1402(a) as "gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business". It is well established that the earnings of an insurance agent who is an independent contractor are "self-employment income" subject to self-employment tax. Simpson v. Commissioner, 64 T.C. 974 (1975); Erickson v. Commissioner, supra (holding that payments to former insurance agent of previously earned commissions are subject to self-employment tax). Petitioner contends that his retirement from gainful employment is a circumstance which bars the application of self-employment tax. Though we agree that petitioner was not self-employed when he received his Termination Payments, we reject his contention that they are exempt from *702 self-employment tax. As we apply the definition of self-employment income, we must ask whether the income in question satisfies the following three requirements: that the income be (1) derived, (2) from a trade or business, (3) carried on by such individual. Sec. 1402(a). The parties are in agreement that petitioner's activities as an agent of State Farm fulfilled the trade or business requirement. The regulations provide that income which is subject to the tax may be derived from self-employment activity which occurred in a prior year. Gross income derived by an individual from a trade or business includes gross income received * * * or accrued * * * in the taxable year from a trade or business even though such income may be attributable in whole or in part to services rendered or other acts performed in a prior taxable year as to which the individual was not subject to the tax on self-employment income. [Sec. 1.1402(a)-1(c), Income Tax Regs.] The original purpose of this provision was to clarify the fact that income received after December 31, 1950, the effective date of the tax on self-employment income, was subject to the tax even though it was derived from activities *703 performed prior to the effective date of the tax. [1] If the tax attached to income derived from services rendered prior to the effective date of the tax but received after that date, there is no reason to think that income derived from services performed in a year in which the individual was subject to self-employment tax should be excluded solely because the income was received in a year subsequent to the performance of the services. *704 We read the word "derived" in its ordinary sense. According to Webster's Third New International Dictionary (1971), the verb "to derive", from the Latin "derivare", literally to draw off water, is an all-inclusive term meaning to take or receive from a specified source. Income which derives from self-employment is income which originates from it, which flows from that source, even though the individual who engaged in the trade or business may no longer be active in it. On the basis of the common meaning of the word "derived", we are compelled to reject petitioner's contention that Termination Payments "were not derived from any trade or business carried on by petitioner in any prior taxable year." Self-employment tax applies to a trade or business "carried on" by the taxpayer. It is sufficient that the trade or business was carried on at some time in the past; income derived from a prior trade or business conducted by the taxpayer remains self-employment income when the taxpayer receives it. Both petitioner and respondent cite Newberry v. Commissioner, 76 T.C. 441 (1981). In that case, the taxpayers' grocery business was destroyed by fire, and *705 the taxpayers received insurance proceeds intended to compensate them for lost income. These "business interruption proceeds" did not constitute self-employment income because inability to conduct business was a necessary precondition of their receipt. For income to be subject to self-employment tax, we said, there must be "a nexus between the income received and a trade or business that is, or was, actually carried on." Id. at 444. This statement is consistent with our holding that petitioner's deferred compensation from his previously conducted insurance business is subject to self-employment tax. The self-employment tax was enacted by the Social Security Act Amendments of 1950, ch. 809, 64 Stat. 477, in order to extend the benefits of Social Security to self-employed individuals. The legislative history of this provision clarifies the meaning of the "carried on" requirement, making it clear that the intended connection is personal, not temporal: The trade or business must be "carried on" by the individual, either personally or through agents or employees, in order for the income to be included in his "net earnings from self-employment." Accordingly, *706 gross income derived by an individual from a trade or business carried on by him does not include income derived by a beneficiary from an estate or trust even though such income is derived from a trade or business carried on by the estate or trust. [S. Rept. 1669, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 302, 354.] See section 1.1402(a)-2(b), Income Tax Regs., which incorporates this language. If the individual receives income from a business which he has not "carried on", the tax does not apply to that income. The individual's activity in carrying on the trade or business is the nexus which determines the incidence of the tax. [2]
*707 The phrase "trade or business carried on" occurs a number of times in the Code and legislative history in the context of self-employment tax. "Net earnings from self-employment", as defined in the first sentence of section 1402(a), has two components: "gross income derived by an individual from any trade or business carried on by such individual * * *, plus his distributive share * * * of income or loss * * * from any trade or business carried on by a partnership of which he is a member". The phrase "carried on by such individual" has its counterpart in the phrase "carried on by a partnership of which he is a member". The implication of this parallelism is that the incidence of the tax falls upon the person who carried on the trade or business. (As a partnership is not a taxable entity, the distributive share of income flows through to the partners.) The significance of the "carried on" requirement is not that the taxpayer must be currently self-employed, but rather that, as we said in Newberry v. Commissioner, supra at 446, "any income must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer". *708 Termination Payments fulfill this requirement as they derive or emanate from business activity previously carried on by petitioner. Petitioner argues that the nexus between his business and his receipt of Termination Payments was even more attenuated than that in Newberry v. Commissioner, supra,as he was "only entitled to Termination Payments upon his retirement from his trade or business as a State Farm agent" and then only if he refrained from competition with State Farm for 1 year. It is clear, however, from our reading of the Agreement that Termination payments were payable not solely to retirees but to any former State Farm agent with 2 years service who refrained from competition for 1 year. Insurance agents typically receive commissions in years subsequent to their sale of policies. In other words, their compensation is typically deferred. It is an established principle that post-termination or renewal commissions of a retired or former insurance agent are subject to self-employment tax. This is true even though the compensation may be paid out in a uniform manner over an extended period of time. Becker v. Tomlinson, 9 AFTR 2d 1408, 62-1 USTC par. 9446 (S.D.Fla. 1962). *709 Petitioner seeks to distinguish the Becker case, as the amount of his Termination Payments is not based upon renewal commissions, but upon his policies in force in the last year of agency and the subsequent year. [3]
Under the terms of the Agreement, a State Farm agent received commissions for a period of 5 years on business personally written by him or her. While the agent maintained a relationship with State Farm, payments were made under a 5-year Schedule of Payments in the Agreement. When an agent's agreement was terminated, Termination Payments were made in lieu of regular commissions for a period of 5 years. During the first of those 5 years, these payments, with the exception of payments by State Farm Life Insurance Co., were equal *710 to 20 percent of the commissions earned by the agent during the 12 months preceding the termination of the Agreement, after a certain threshold had been reached. The record does not address the issue of the differences, from the insurance industry's point of view, between renewal commissions and Termination Payments. It is clear to us, however, that Termination Payments are analogous to the payments in Becker v. Tomlinson, supra, in that they constitute the payment of previously earned commissions, similar to the deferred commissions that an active insurance agent would receive. This conclusion is borne out by the fact that State Farm Life Insurance Co.'s contribution to Termination Payments is equal to the regular service payments, i.e., commissions, that an agent would receive from that company. Petitioner concedes that this component of his Termination Payments is subject to self-employment tax. We find that Termination Payments are the equivalent of the deferred compensation which a State Farm agent, active or retired, would receive from policies sold in prior years. On this basis, we hold that Termination Payments are derived *711 from self-employment, even though they are received in years subsequent to the activity which generated them. Consequently, we hold that Termination Payments constitute income from self-employment and are subject to self-employment tax. Decision will be entered for respondent. Footnotes
1. Sec. 481(a) and (b) of the 1939 Code, part of the Social Security Act Amendments of 1950, ch. 809, sec. 208(a), 64 Stat. 541, defined "self-employment income" as "gross income derived by an individual from any trade or business carried on by such individual, * * * during any taxable year beginning after December 31, 1950". Respondent's position was that income which was "derived", i.e., received, during any taxable year beginning after Dec. 31, 1950, was subject to the tax, even though the business was carried on solely before that date. I.T. 4077, 1952-1 C.B. 149. This position was incorporated in the income tax regulations by T.D. 6196, 1956-2 C.B. 537, adopted Aug. 13, 1956, amended by T.D. 6691, 1963-2 C.B. 347, and by T.D. 7333, 1975-1 C.B. 279. See Mullowney v. Hobby, 134 F. Supp. 419↩ (D. Neb. 1955) (payments received after 1950 with respect to contracts acquired in 1949 not self-employment income, as the market value of the contracts was income in 1949).
2. This conclusion is borne out by the additional statement in the Senate report that income of a partnership derived from sources clearly unrelated to the trade or business carried on by it is excluded in determining the net earnings from self-employment of the partners. S. Rept. 1669, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 302↩, 354. This would not be income from a trade or business "carried on" by the partnership.
3. Information provided to petitioner by State Farm concerning Termination Payments states: "These payments * * * should not be considered renewal commissions." Despite this fact, petitioner concedes that payments from State Farm Life Insurance Co. are renewal commissions.↩